For the plaintiff's appellants we have Eugene Bolin. Yes, Your Honor. And for the defendant's appellees we have Michael King. Yes, Your Honor. We appreciate Mr. Bolin and Mr. King your presence today and so please proceed. Mr. Bolin, we have this case set for 20 minutes per side. If you want to make a rebuttal argument, please stop short of the full 20 minutes and save some time. And I'll also say neither, just as in the last case, neither of you needs to use your full amount of time. But we've set it so go for it. I will stop well short of my time, Your Honor. May it please the court, my name is Gene Bolin. With us today in the courtroom is Mary Marturello in pink, the mother of Rachel Marturello, still a resident of Kent, and Leanne Lafley to her right, presently residing in Montana. Ms. Lafley drove here yesterday to be with us today. During the court's ruling on the motion for summary judgment, the defendant's motion for summary judgment in this case, she based her ruling primarily on two facts. One was that the two girls that were killed in this case were safe on the west or left-hand set of tracks as the Amtrak train, this is a Togo 13-car train set, proceeded across the trestle at 60 miles an hour. She made that conclusion based solely on one person's testimony, and that was the engineers. Two experts in this case, Bob Boston from the WUTC, an experienced investigator in fatality train accidents, and the plaintiff's own expert, Charles Culver from Houston, Texas, both testified that it is very dangerous, quote, very dangerous to be on the trestle at any time when a 500-ton train is moving across it at 60 or 65 miles an hour. I think the information in this case shows that the train was probably moving, according to the event recorder, at 63 or 64 miles per hour as it passed over the trestle. It's also worth stating that none of the experts in this case, in all of the times that we were at the trestle taking photographs and measurements, none of the experts, including experienced trainmen in this case, were willing to stand on the trestle at any time when any Amtrak train was passing over the trestle at that speed or at any other speed. The other fact upon which Judge Rothstein based her order, her conclusion, was that the girls disappeared at some point when the train passed over the trestle. She again made that ruling based solely on one person's testimony, and that was the engineer's. Mr. Reitmeier. The engineer's testimony, as I recall it, was something like this. He's some distance from the trestle. There's a report of kids playing chicken on the track ahead. He proceeds. There's a little higher speed limit. He gets near the trestle, let's say, I don't know, a half mile or something, and he sees kids on the trestle, and he brakes maybe from close to 80 down to the mid 60s miles per hour. But then he sees the kids move to the opposite track on the trestle. Is that it? He thinks they've moved like off his track to the track on the other side. That's correct. Still out on the trestle. That's correct. Above the ground. And so at that point he eases off the brake or lets go of the brake and proceeds, and then he says the children appeared on the track at the last minute then. I think this is what the facts show, and I think it's important. I want to review this scenario with each of you because I think in all of these cases involving willful and wanton misconduct, the facts are everything. He received a radio message five minutes before arriving at the trestle that kids were, quote, quote, kids are playing on the trestle. The issue here, I take it, is whether the conduct of the engineer or the railroad was wanton. There's not really an issue of willfulness like they were trying to hit the children. That's exactly correct, Your Honor. And what we're contending is that both the railroad and the engineer acted with complete and utter disregard for the consequences under all of the circumstances which would have led any reasonable person to conclude that these girls were in dire, dire danger as this locomotive approached. So the engineer gets a radio warning five minutes ahead of time. He reduces his speed. He gets a warning that the kids are playing on a trestle. That's right. These kids were not playing on the trestle. All the evidence shows that. He doesn't know that. Wait a moment. Sorry, Your Honor. We don't even know these are the same kids, in other words, because these kids weren't playing on the trestle. We know that. Correct? That's true. Okay. So these were not the kids that were supposedly playing on the trestle. So what exactly is the significance of some kids were playing on the trestle at some time? Well, the correlation in time makes it very, very likely in this engineer's mind, especially as he approaches the trestle just moments later and sees kids on the trestle, that these are, in fact, the kids that are, quote, playing chicken on the Most engineers working for Amtrak, and that is playing chicken with trains, means that kids have a deliberate disregard for their own safety. In other words, you cannot trust them to do the right thing. That's the message the engineer gets. And I don't believe, Your Honor, that the case, we necessarily have to get into the mind of the engineer and subjectively try to determine what he was thinking. But we can look at these objective facts and try to determine what a reasonable person might have been thinking. So he gets this radio message five minutes out, and then what he, instead of increasing or decreasing his speed, he increases his speed. He goes through a 40-mile-an-hour zone, then increases it above the 75-mile-an-hour track speed, or, excuse me, timetable limit in that area. He sees the girls a half a mile away on the trestle, and he sees them at what is the south end. Now, from what happens at this point on is very careful. What he sees from a half-mile out, he hits his, he sounds his whistle, by the way. Amtrak's expert determines that at this point, the girls, the train arrives at the trestle about 26 seconds after the horn is sounded, which is consistent with a speed of about 63 or 64 miles an hour. Sounds the whistle, didn't he? And he slows down from, let's say, 79 to 65 or something like that. But he doesn't slow down for the girls. He slows down for his next crossing. And he says twice in his deposition, which is in our brief, that he's slowing down anyway. So all he's really doing, all the engineer admits doing for the girls, is sounding his whistle. He slows down, at least as I understand it. It's a summary judgment. And so you don't have to show, prove that he was thinking the girls were playing chicken. Just could a jury determine that a reasonable engineer would have thought maybe these are the kids who were playing chicken, whether they were or not? That's correct. Because it's a summary judgment. So could a jury look at it like he should have thought maybe these are the kids that were playing chicken? That's right. So the question is, why didn't he keep slowing down as opposed to rolling across at 65 or 63 miles an hour? That's right. And this train could have stopped at a quarter of a mile. He was a half a mile away from the track. We're not suggesting that he should have stopped. But rather, the plaintiff's train expert, Charles Culver, suggested what he should have done was to slow the train to 30 or 40 miles an hour so he would have it under control as he approached the trestle. And of course, if he puts the train into emergency on the trestle, that arises or, excuse me, increases geometrically the chances of a mishap, not only for the girls on the trestle, but for the passengers in the train. Does the record show what setting he had on his engine on run six or something like that? I'm not sure about run six. Well, they have these diesel I've almost my experience with railroads was back in the days of steam. But I understand on these new engines, they just they have settings for level ground, adverse grades, they have dynamic braking on the downgrades and they have settings on the engine that control those speeds and they have orders. Now, did your discovery produce any orders that he had the engineer had on this route? No, Your Honor. No. Other than the two speed limits, there's a track limit and there's a timetable limit. And he's obliged to comply with the timetable limit. Is there any evidence that he deviated from his timetable speeds? Yes. Only by four miles an hour, which is which is hardly worth raising for any point except he did that after receiving the radio message, which suggests more wanton disregard approaching the trestle at a speed of seventy nine miles an hour. You say that he can stop this train in a quarter of a mile. Yes. Sixteen hundred feet. Sixty miles an hour. That's right. This this train is pulling air, empty passenger, largely empty passenger cars. That's all it's pulling. It's a European Swiss or European Togo train set. And they they stop in sixteen hundred feet. And that's consistent. This train stopped in sixteen hundred feet using only its service brakes. Emergency brakes would have resulted in a much shorter stop. So as the train is approaching the trestle for twenty six seconds, he sees the girls at the south end of the trestle. He's headed north. The trestle is not one hundred and eighty six feet long as the as Amtrak states in their brief. It's actually closer to two hundred and twenty two feet long, including the 220 foot abutments that were added in nineteen eighty seven, I believe. So the girls have another 20 feet to go and in all they have one hundred and two feet to go. They're actually in the middle of the trestle. He thinks they're at the south end of the trestle. For all the engineer knows, they have to cover two hundred feet and twenty six seconds, which is impossible because the ties don't permit anybody to run or even walk quickly over the trestle. So what does the engineer do? Instead of doing the prudent thing and slowing down, he forges ahead at sixty three or sixty four miles an hour. And while he's doing this, he is watching the backs of these girls struggle to try to get off the trestle. And that's what makes this wanton. It is the you can look in every train case involving bridges and trestles. And I think I've read it, everyone. And you cannot find a case where a train is running down pedestrians for twenty six seconds on a trestle after receiving actual notice that they're there. He could have been asleep. He could have been anything. But we know he knows they're on the bridge. We know he's looking at them. And for twenty at least twenty six seconds, he runs them down on the trestle. Is it his testimony? Is it the engineer's testimony that after he saw the kids and put aside whether they were the ones playing chicken, but after he actually had a visual on them on the trestle, that he did not break it that break further at that point or he did not. I thought he breaked and he blew that blew his horn. That's right. Your Honor stated it correctly earlier. That is that he he slowed down. He slowed down to 63 or 64, 15 miles an hour and proceeded. Now, he says he was slowing down because he had to anyway. He refuses to drop the speed to the mid 60s, but he's still proceeding with the kids back to him. That's right. And they're on the trestle and running back and forth from track to track. And you're saying at that point, did he say he was trying to break the train or not? He was not. In fact, the the the event recorder shows that he only applied his service break after he cleared the trestle entirely after the girls were struck. Excuse me, you said he was running back and forth from track to track. I thought they were on the track. They went to the other side of the track. By this time, the train is at the trestle and they come back to know they come back to the track before it's you saying they they bounce more than one time, they bounce back and forth between the two that the engineer gave to the police officer minutes after it occurred. He said they were running back and forth on the trestle ahead of him in the 26 seconds as he approached. I thought there was evidence from which a jury could determine that they never got off the trestle, that they were they may have moved to the opposite track on the trestle, but they were still on the trestle. We know they never got off the trestle. They were hit on the trestle. They were hit. They were 20, 19 feet left to go. But they didn't get off the trestle and go back onto it. Correct. They just they moved from one track to the other track back and forth. Right. As they have in other cases involving Amtrak that we refer to in our briefing. Did I hear you right? He said he saw them going from the safe track to the dangerous track and then back and forth. Is the language he used to the police officer in describing what happened on his approach to the trestle. Now, I think Amtrak wants you to think of this as a train case and what we should be doing, I respectfully submit, is thinking of it as a wanton case. Does that conduct satisfy the definition of wantonness under the WPI 1401? And what we should do is imagine ourselves driving over an ancient steel bridge, black diamond or some place. You're in your car. You're driving 60 miles an hour or 65 miles an hour. You see kids on a steel bridge ahead of you moving back and forth from lane to lane. Would it be wanton to proceed over the bridge at 65 miles an hour, 63, 64, 65 because the girls have momentarily moved to the left lane? No. That is wanton conduct. That is acting in careless disregard for the girls in that hypothetical and in this case. This man has been, the engineer has been driving this train for 29, driving trains, not necessarily this one, 29 years. He operates his train as a professional, probably has better knowledge of it than we have of our own automobiles. He's also had some other collateral damage cases. That's right. And under Evans v. Miller, we believe that's relevant and should be admitted. He is previously struck and killed 13 years earlier. Another girl on a trestle under very similar circumstances didn't slow his speed, sounded his horn, but he didn't slow his speed significantly. And then he struck a boy three years before this incident in White Castle, B.C., who he said was playing chicken, and that is jumping back and forth on and off the track. So from our perspective, this case not just somewhat satisfies our burden as the nonmoving party in summary judgment, but we believed that the evidence was overwhelming. You cannot find a case like this that is dismissed on summary judgment for insufficient evidence. You cannot find them because they don't exist. You're saying that the issue of fact, I mean, you're saying more than this, but part of what you're saying, as I understand this, there's an issue of fact on wantonness of the engineer, because having seen the children on the trestle, he didn't, he may have blown his horn and slowed to some extent, but he still proceeded in the direction of the children at 60 plus miles an hour while he knew they were on the trestle. That's correct. And he sees them struggling to save their own lives. That's the most material part of it. I suppose that an adult male, two adult males may have enough chutzpah to do what the Amtrak is suggesting was done here, and that is the kids are on the trestle and you can proceed at speed across the trestle in any event. But that's not true here. We have an 11 and a 13-year-old girl that were described five minutes earlier to this engineer as kids. And under all of those circumstances, this is, this case has wantonness written all over it. And we believe that, I won't belabor the court, but except to point out your attention to beginning at page 40 of our briefing, I wouldn't raise this except I was taken to task just a bit in. You might want to save a couple of minutes for your rebuttal, if you want. I'll save it for my rebuttal. That's an excellent suggestion, Your Honor. Mr. King, welcome again to our courtroom. Thank you, Your Honor. If I may take a moment to retrieve this stand, I may be showing you a blow-up of one of the patients. May it please the Court. At some point in your argument, I mean, we're not going to decide as a panel whether the engineer or the railroad was wanton in their conduct. All we are deciding, as I understand it, is was there sufficient evidence to let a jury hear the evidence and make that decision. So I hope you will address that at some point in your argument. That's exactly what I'm going to go to the heart of, I hope, Your Honor, and in short order. For the record, Michael King, along with June Campbell, who's with me at counsel table, and Mr. Wackerbarth on the brief, we're from Lane Powell here in Seattle, and we're here on behalf of Amtrak. We submit that the question that the Court has just posed is controlled by the application of well-established principles of Washington law to the record of this case. To successfully challenge Judge Rothstein's summary judgment, the plaintiff has to show that a jury could reasonably find that Engineer Reithmeier wantonly disregarded the safety of the trespassers and that this wanton disregard caused their deaths. Now, the plaintiffs are required to do this, we submit, by several well-established principles of Washington law, and especially in light of the Court's questions and Mr. Boland's answers about particular facts, I think it's important to keep those principles in mind. Let me briefly summarize them. Number one, trespassers are owed only this duty, that their safety not be willfully or wantonly disregarded. Number two, a railroad track is a place of danger, and those who trespass upon railroad tracks are charged with knowledge of that danger. Number three, the operator of a train, and this is particularly important in light of the dialogue that has just ensued, the operator of a train is entitled to assume that when the operator spots a trespasser and blows the whistle as a warning, that the trespasser is ordinarily going to get out of the way. They are going to remove himself or herself from the zone of danger. Now, let's apply those principles to the facts of this case. Well, let me ask you a question about that. First of all, it is a trespasser situation. That's why ordinary negligence isn't enough, as I understand it. If the engineer is negligent or the railroad is, then they win. But as to whether conduct is wanton, although normally you might think someone would get out of the way when you blow a whistle, if they're out in the middle of a bridge that's, you know, high above whatever it's above, they can't step to the side off the bridge. Why isn't it wanton for the engineer to proceed after he has them in sight without breaking as well as he or she can? Let me step back and respond to that in two ways. First, there was breaking here. At a spot of the trespassers blew the whistle and slowed down. Slowed down from the 79 miles an hour that the engine was proceeding at, which, by the way, Judge Goodwin, is the operative speed limit here, 80 miles an hour. That's the federal speed limit. The BNSF speed limit that it imposes on its trains for whatever reason, the 75 mile an hour speed limit, doesn't control, has no obligation. But he slowed down roughly 15 miles an hour. Right. But why isn't it wanton seeing a person on a trestle in front of you to not continue to slow down as much as you can when you have them in sight? It's not deliberately indifferent to life, and here's why. Why not? First, if you're talking about trestles in particular, all trestles are not created alike. Now, what we're really dealing with is the theory that I submit has been interjected into this case in the reply brief, the suggestion that trestles are so inherently dangerous that you can't rely on the ordinary principle that if you blow the whistle, people are going to get out of danger. Setting aside the question whether that theory is properly in play in the case being raised in the reply brief, setting aside the question whether that's really an attempt to backdoor some sort of attractive nuisance theory, which was abandoned on appeal and which has been repudiated by court after court across the United States, the trestles... We're not looking at an attractive nuisance. We're not looking at an attractive nuisance. This is what you're looking at, Your Honor. This is a reproduction of pictures from ER 65. Now, there are trestles. I will agree. There are lots of trestle cases that have been cited to you in the reply brief, and there are lots of trestle cases where you've got a single trestle, say, over water or over a gorge. I mean, I'm perhaps the only person in my generation who somehow missed the movie Stand By Me, but I suspect that some of you have seen it. And there are circumstances where if somebody's on a trestle and the operator spots them and blows the whistle and slows down and sees, you know, they're not getting out of the way because they have no place else to go other than to get off the trestle, then it would be deliberate indifference to life not to do more. But that's not this trestle and that's not this case. Why wouldn't that be? You know, if you concede that there are some trestles that to proceed ahead while you saw someone on them would be deliberately indifferent or would be wanton, why isn't that a jury question whether this trestle under the circumstances is something like that? I didn't say that I was conceding that just because somebody was on a single track trestle and you blew the whistle and you slowed down and you saw that they were getting out of the way, but that necessarily meant that it would be deliberately indifferent to life to fail to throw the emergency brakes, to fail to bring the train to a halt. What I would submit is it's not a jury question for these reasons. First, as plaintiff's own expert admits, and this is expert testimony in the context of a negligence case. Mr. Boland referred to his expert. Well, take a look at ER 81 and look at the testimony of Mr. Culver and this is at manuscript page 134 and you will see if you read the exchange, the answer to the question lines two through eight, he's acknowledging that the analysis of the judgment call depends upon the kind of bridge. Well, this is a bridge where if the train is coming on the east track as it was here and blows the whistle, you can move over to the west track and you're out of the zone of peril. And that is in fact what happened here. The whistle was blown and they got out of the zone of peril. So just because the trespassers are seen to have moved from the west to the, from the east to the west track and to be proceeding up the track, two of them, one of them got off because she was at the south end and she got off. The other two were farther up the track and so they proceeded up the trestle. They chose to proceed up the trestle. But before they proceeded up the trestle, they moved from the east track, which is the dangerous spot, to the west track, which is not a dangerous spot. They are out of the zone of peril. To say that the engineer, who has now observed that the trespassers have done what they ordinarily do, to say that the engineer has to do more, that's just not what a reasonable jury can infer. I think, I don't know if this is in the record or not, but they have orders on the trains I've been on to slow down even if there are maintenance of the way personnel working on the track had to slow down and not just leave it on, on flank or cruising speed when they're passing workers who were on the, on the roadbed. And you'd think if, if they see kids, apparently, as he said, I understand he said, he saw them change tracks from the danger track to the safe track and back again. Ah, ah, first, if they switch, if they change tracks more than once, it would certainly sound to me like a jury question whether he should have been on this to reduce the speed further. I don't know what their orders are when they're passing section men working on the track, but I don't think they go past them at 60 miles an hour. Your Honor, there's nothing in the record about these standing orders. What is in the record is that it is left to the judgment of these engineers to make a determination about whether it's appropriate to take any particular step in response to trespassers. And let's keep in mind here, we're not talking about a freight train that is carrying some empty cars down the track. We're talking about a passenger train, a common carrier where the highest duty of responsibility is owed to those passengers. Is that right? Even if there's, if someone was laying on the tracks, the engineer owes a higher duty to the passengers than the person on the tracks? Your Honor, let me be blunt. Well, if there is a circumstance where you blow the whistle and somebody doesn't move and you're past the point where you can't do anything other than emergency brake, I would submit to you that it would be an appropriate exercise and certainly not a deliberately indifferent exercise to safety for the engineer. Because of the danger of the emergency brake. Exactly. But what about just regular brakes? As I understood the record here, that the driver slowed down with the regular brakes by 15 miles per hour, but did not attempt to continue slowing down at that point. At that point, just thought, okay, I've slowed down a certain degree and then kept rolling. If I could address your point and then get back to Judge Goodwin's point about whether people were chipping and chopping back and forth, because Judge Fernandez, you asked a question about that as well. Because I think that latter is really a central question here in evaluating the indifference, the alleged indifference of this engineer. First of all, the precise evidence in the record is not as it's been characterized to you. What the engineer did was he blew the whistle and he dropped his speed from 79 to around 60 to 65. He then saw that these individuals had moved out of the way. Now, the suggestion is that he didn't drop his speed in response to the presence of the trespassers. Well, that's a mischaracterization. As I understood the argument in the briefs, it was that he slowed his speed when he saw the kids. But when he got to a certain point, it was slowed by 15 miles per hour and he thought the kids moved to the other track. Then he continued. He didn't continue to brake. That is correct. He took his foot off the brakes. However, it is incorrect to suggest that his decision to slow down was not animated at all at the critical point of spotting the trespassers and deciding what to do. It is incorrect to suggest that he was not animated at that point to slow down in response to the presence of the trespassers. And this goes to evaluating whether he's deliberately indifferent to light, whether he's like that driver in the Liebhardt case who comes charging down the road and has two cars parked on either side without sounding the horn, without slowing down. That's deliberate indifference. His testimony, and I urge you to re-review ER 128, which is Mr. Reithmeier's testimony in this point, is he says that at the point they got out of the way, there was certainly no reason to increase the speed and I was going to be slowing down anyway because I customarily slow down going over the trestle because I'm approaching another crossing. At what speed? 70 miles an hour. That's his testimony. He customarily goes over that trestle at 70 and yet he has 2,600 feet before this trestle already slowed down to several miles below. So no jury could reasonably infer. But normally he goes across the bridge, Mr. King. There's no one on the bridge. He doesn't see anyone standing on the tracks. So my question really or what's bothering me about the case, just so you have a better idea, is that I think the record shows the engineer slowed down in response to seeing the kids. Slowed down 15 miles an hour. But I think the record is that the engineer then continued, you know, took the hand off or foot off the brake and continued at the mid 60 miles per hour. Agreed. Knowing that the kids were still on the trestle. But no. Maybe thinking they'd moved to the other track. Yes. But knowing they were still on the trestle. And what's bothering me is why wouldn't an engineer in those circumstances knowing someone's on the track. Maybe they're on the so-called safe track. Yes. Maybe he thinks they're not right in front of his train. But still, knowing that there are humans on a track on the trestle, why wouldn't the engineer slow down? Or at least why shouldn't a jury be able to assess that? Your Honor, let me try to put this. This seems like a bizarre conduct. Your Honor, let me try to be as bold about this as I can be. If this jurisdiction had a negligence test, we don't get summary judgment. I understand that. But we're being asked to evaluate whether this engineer was deliberately indifferent to life under the Washington Trespass Law, which says a track is a place of danger. Trespassers are unnoticed. Engineers aren't obligated to slow down at all. They are only obligated to blow the whistle and then to see what the trespasser does. The trespasser got out of the way. This isn't a resumed zone of peril. The trespasser did not get out of the trestle, though. They got out of the... They got out of the track in front of the train. And I submit to you that's out of the zone of danger. And that's why the plaintiffs are trying so hard to persuade you there's an issue of fact about chipping and chopping back and forth. And let's go to that. Because in answer to Judge Fernandez's question and Judge Goodwin, you followed up on this. When the question was raised, were you saying they bounced back and forth after the whistle was blown? You know, as the engineer is proceeding towards that trestle, have the trespassers gone to the east and stayed to the east? They're proceeding up the trestle. But have they gone to the east and stayed to the east? Or could a jury reasonably find, no, they were going back and forth? You're told, ah, a jury could find that. Well, there are three problems with this. Number one, you're told, read the report. Well, he's referring to the Kent Police Department report. This is ER 248. I quote, Reithmeier said that he sounded the horn at the South 277 Street crossing and that as soon as he saw the pedestrians, he applied the brakes and sounded the horn again. The pedestrians moved from the east track to the west track. And Reithmeier said he released the brakes. Now, in front of the district court, there was oral argument. And as a result of that oral argument, you will recall that Judge Rostein in her order said the plaintiffs are not disputing because they cannot, that in response to the whistle, the trespassers moved from the east side to the west side and stayed there. Why did Judge Rostein come to that conclusion? Well, I urge you to review ER 317 through 318 because this is where Judge Rostein hones in on counsel's argument. The court, where are you getting this insight into the engineer's mind? Because the way Ms. Campbell, my colleague here, described it, he thought they were off the track. If you're telling me that he believed they were running north on the track, she's telling me that he saw them get off the track, referring to the east track. Mr. Boland, let me describe the discrepancy in the testimony. And at this point, you can just imagine, Judge Rostein is waiting to hear, okay, there's something in Reithmeier's testimony that's discrepant on this critical point. What does he proceed to talk about? Well, for several lines, he goes on about the disappearing issue. There's this discrepancy. You know, does Mr. Reithmeier tell these folks that the trespassers squatted down, implying they remained in view? And is that a discrepancy with his deposition testimony three years later, where he describes them disappearing off the east side? And Mr. Boland goes into that discrepancy, and then the court intervenes. This is on ER 318. What did he say? He said the girls, he said the girls were moving from back and forth from one track to the next. They moved to the western track, and he thought they were okay. The court, that's the same thing, meaning the same thing as Ms. Campbell was telling me, Mr. Boland. No, because they're in view. They're in view. He says in his deposition that the girls, quote, disappeared. The court. That's after they ran back. In other words, as Ms. Campbell had said, as Mr. Reithmeier testified, they heard the whistle, went to the west, moved up the trestle, and they got right to this point, right off the bridge superstructure, over here, and then they cut back. And Mr. Boland says, after they ran back to the other side of the tracks, question mark, the court, uh-huh. Mr. Boland, well, you cannot, you cannot disappear in this trestle. And he goes back to his argument about what he wants to focus on. Yes, there's an issue of fact about whether, uh, Mr. Reithmeier saw the girls disappear, whether they stayed in view, and he can be impeached on that point, but as the judge recognized, it's completely collateral. There's a final point to consider here, and that's the physical evidence. Remember, it's emphasized that one of the decedents has cerebral palsy and has difficulty running, and another of the decedents, although there's not evidence in the record, repeatedly counsel represents to the court the other decedent weighed 240 pounds. I want you to look at the physical evidence here. This notion of zigzagging back and forth as they're proceeding up this track requires a jury to find that on this structure, these two girls would have been able to do that. That's just implausible on top of everything else. No reasonable jury could find they're zigzagging. Now, why does this matter, Your Honor? Because although, Judge Gould, I recognize that, and I sense that if you were... I'm bothered even if they're not zigzagging. I know, I know. If you were, not of you, but if a young child is seen on the track on the trestle that the train's not on, but standing there on the track, can the driver blow his or her whistle and run past that person? Well, let's say it was a worker. Like a 5- or 6- or 7-year-old child? Because the rule's different in Washington. If it's a 5- or 6- or 7-year-old child... Even an adult. Can they blow their whistle and run past that person at 60-some miles an hour? If we're talking about a track and somebody's standing next to a track, that's a different case. That's a different case. If you're talking about a double track, they're on the track where the train is approaching, the whistle's blown, and they get off that track. They go to the other track. They're out of the zone of peril. You might say, look, the reasonably prudent engineer should do something different. That, you know, the most prudent, the most cautious... That isn't what I would say. The question in my mind is whether a jury on this evidence could say that the engineer not doing something different is wanton. No, because what the jury is going to end up doing as a matter of sympathy and human instinct and the feeling that it just should be done differently, they are going to be applying a negligence test, and I submit to you, Your Honor, that you are applying. In fact, what amounts to a negligence test, this engineer was not, as a matter of law, deliberately indifferent to life. Maybe you'd make a different call and wish he had, but he was not, as a matter of law, deliberately indifferent to life. And if I could just sum up here... He's taking a lot of your time, so if you need a couple more minutes, go ahead. He sees trespassers. He's entitled to assume they're going to get out of the way if he blows the whistle. 99% of them do, according to Mr. Boston's own testimony. He blows the whistle, they get out of the way. They move to the safe side of the trestle. It's not as safe as being off the track entirely, but it's out of the zone of peril. And if they stay there, they're fine. And he doesn't speed back up. He stays below the speed that he would normally take this. And then they cut back across. And even if you were to take Mr. Reithmeyer's testimony and toss it out, we'd just have a mystery. There'd be no basis for the jury to do anything but speculate how the girls got from towards the south end to being at the east end on the far east side. This is a trespasser case. The test is deliberate indifference. And Mr. Reithmeyer didn't do what that driver did in Leap Heart. And trestles are not all the same and inherently dangerous. You've got to look at the design. This one is 29 feet from outer tie to outer tie. If they had stayed where they were, they would have been safe. Tragically, they cut back. At that point, it's admitted nothing. Not even emergency braking could save them. Summary judgment was correctly granted by Judge Rothschild. Thank you. Thank you, sir. I appreciate your argument. I think your colleague, Mr. Bullen, or your adversary in this case, has about a minute, two minutes of rebuttal. You have just had a demonstration as to why Mr. King won the National Collegiate Debating Tournament at Harvard in 1979. You're both pretty good advocates. I hope, however, that you don't decide it on my ability because really the facts are much greater than that. Mr. King is really, he's accusing me of sort of playing fast and loose with the facts. The relevant testimony about back and forth is on page 15 of our brief at the top. It was the information about going back and forth was actually provided by the engineer himself, which he tried to disavow during his deposition testimony. It is dangerous. It's dangerous, dangerous, dangerous. And these folks have been representing train companies for 50 years, this firm, and they know that standing on a trestle with a train going by at 65 miles an hour, the blow-by from the blast alone makes it hazardous to be on that left track. That's why no experienced train man will stand on a trestle when a 500-ton machine goes by at that speed. Now, on page 41 of our brief, I was going to recite this. The reason that I think Judge Rothstein ruled the way that she did is that she just could not believe that an engineer would do what he did in this case. In this case, we have not only this. We have the Nisqually Bridge incident. We have the Stuck River incident. And we have the absence of any policies. These are true and false questions. I'll close with this briefly. Amtrak has never taken, and these begin on page 40 of our opening brief, Amtrak has never taken any action against an engineer involved in a fatality incident with a trespasser or pedestrian. The only duty of an engineer with respect to trespassers is to blow their whistle, which is what occurred in this case. All this is testimony from Mr. Branson, the senior-most manager of the Pacific Division. No regulation requires engineers to attempt to avoid killing or injuring a trespasser. Amtrak engineers are not required to exercise any additional care when operating a locomotive in a heavily populated area. All these were true and false questions. There's no interpretation involved. And they're all at ER 202, 203, 213. Amtrak engineers are not required to exercise any more care when they see children on tracks ahead of their locomotives compared to adults. Amtrak engineers are not required to prevent trespasser fatalities even where it's possible to do so. That is stunning testimony. Amtrak does not even encourage, according to Mr. Branson, its engineers to prevent fatalities among trespassers. Finally, Amtrak is not interested in collecting fatality records for their engineers because it's not relevant to their competency. This is one of those cases, Your Honor, where you can actually prevent future deaths by telling Amtrak to do the right thing. Avoid deaths of trespassers where it's possible to do so, especially with slight effort, as it was in this case. Thank you very much. I appreciate the spirited argument on both sides. Martorello is submitted. We have Constantine B. Barnard is submitted on the briefs. And so that ends our day, and we will recess. And we thank counsel again for the excellent arguments. Thank you.
judges: Goodwin, Fernandez, Gould